USCA1 Opinion

 

 July 24, 1996 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1549 UNITED STATES OF AMERICA, Appellee, v. FRANCIS J. PROCOPIO, Defendant, Appellant. ____________________ No. 95-1550 UNITED STATES OF AMERICA, Appellee, v. VINCENT A. LATTANZIO, Defendant, Appellant. ____________________ No. 95-1551 UNITED STATES OF AMERICA, Appellee, v. BERNARD KILEY, Defendant, Appellant. ____________________ ERRATA SHEET ERRATA SHEET The opinion of this court issued on July 9, 1996, is amended as follows: On page 29, paragraph 2, line 8, insert footnote 3 after the words " . . . a fair trial." to read: "In light of our criticism of the rebuttal argument, we think it fair to note that the assistant United States Attorney who argued this case on appeal was not the prosecutor who presented the rebuttal argument at trial." UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1549 UNITED STATES OF AMERICA, Appellee, v. FRANCIS J. PROCOPIO, Defendant, Appellant. ____________________ No. 95-1550 UNITED STATES OF AMERICA, Appellee, v. VINCENT A. LATTANZIO, Defendant, Appellant. ____________________ No. 95-1551 UNITED STATES OF AMERICA, Appellee, v. BERNARD KILEY, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Frank H. Freedman, Senior U.S. District Judge] __________________________ ____________________ Before Selya, Cyr and Boudin, Circuit Judges. ______________ ____________________ Richard J. Shea, by Appointment of the Court, for appellant _________________ Francis J. Procopio. Kevin G. Murphy, by Appointment of the Court, with whom Dusel, ________________ _____ Murphy, Fennell, Liquori & Powers was on brief for appellant Vincent __________________________________ A. Lattanzio. Stewart T. Graham, Jr., by Appointment of the Court, with whom _______________________ Graham & Graham was on brief for appellant Bernard Kiley. _______________ C. Jeffrey Kinder, Assistant United States Attorney, with whom __________________ Donald K. Stern, United States Attorney, was on brief for the United _______________ States. ____________________ July 9, 1996 ____________________ BOUDIN, Circuit Judge. On April 9, 1991, three armed, _____________ masked men stole $1.2 million in cash about to be loaded into an armored car belonging to Berkshire Armored Car Services, Inc. ("Berkshire"). The crime occurred in Pittsfield, Massachusetts. On June 10, 1993, the government indicted Bernard J. Kiley, Vincent A. Lattanzio, Donald J. Abbott, Francis J. Procopio and Charles R. Gattuso. The government believed that the first three men had committed the robbery and that the other two had aided the venture. The indictment charged all five men with conspiracy to interfere with, and interference with, commerce by means of robbery, 18 U.S.C. 1951, and with robbery of bank funds, 18 U.S.C. 2113(a). Kiley and Procopio were also charged with money laundering, 18 U.S.C. 1956(a)(1)(B)(i), (ii). A superseding indictment was handed down on September 30, 1993, adding firearms counts against Lattanzio and Kiley, 18 U.S.C. 922(g)(1) & 924(c)(1), (2), as well as a forfeiture count against Kiley, 18 U.S.C. 982. In due course, Gattuso pled guilty to conspiracy and entered into a cooperation agreement with the government. Abbott was murdered prior to trial. The district court severed the firearms charges from the other counts; the three remaining defendants (Kiley, Lattanzio and Procopio) were convicted on all other counts after a 14-day trial beginning on October 6, 1994. A second jury convicted Kiley and -3- -3- Lattanzio on the firearm counts on December 14, 1994. All three defendants appealed, praying for new trials on all counts. In briefs and oral arguments by able counsel, Kiley, Lattanzio and Procopio raise three major challenges to their convictions. First, claiming that various government searches violated the Fourth Amendment, they contend that the district court erred in failing to suppress evidence. Second, defendants argue that the court erred in admitting evidence of possible preparations for a later robbery. Finally, defendants urge that remarks by one of the prosecutors constituted misconduct warranting a new trial. We affirm. I. BACKGROUND __________ Because there is no challenge to the adequacy of the evidence, we do not describe what the jury would have been entitled to find, viewing the evidence in the light most favorable to the government. Instead, we offer a neutral description of the evidence at trial to illuminate the defendants' claims of error and to provide a background against which to judge defendants' claims of prejudice. Facts relevant to the suppression motions are set forth separately in the discussion of those issues. The government's case began with the testimony of the two Berkshire guards, Allan Mongeon and James Cota. They -4- -4- testified that three men, armed and masked, accosted them while they were loading bags of money into a Berkshire armored truck in Pittsfield on April 9, 1991. The door of the loading bay was open, in violation of regular procedures, because the truck inside the bay was loaded with pallets, and a second truck, which the guards decided to use, was parked directly outside the bay. Although the guards offered little physical description of the robbers, they said that one of the three men had been older and shorter than the other two and that he had a salt- and-pepper mustache; a false mustache matching that description was later recovered from Kiley's home. Mongeon was able to get a look at the right front portion of the robbers' get-away car; he described it at the time as a tan sedan of late-70s vintage, probably a Plymouth Volare; he later identified as the car he had seen a tan-and-brown 1979 Buick Regal, which had belonged to Procopio at the time of the robbery. In addition, Mongeon testified that one of the robbers had called out "Chuck, what are you doing." None of the individuals claimed by the government to have carried out the robbery--Kiley, Lattanzio, and Abbott--was named Chuck, but Gattuso was sometimes referred to by that name. However, the government established that Gattuso was well known to Mongeon (Gattuso having been fired by Berkshire two weeks before the -5- -5- robbery); the point was to suggest that Mongeon would have recognized Gattuso's voice had he been present. Gattuso then testified. He said that Kiley had approached him early in March 1991, at the suggestion of Gattuso's brother Dino, for help in planning the Berkshire robbery. Gattuso later decided to join, bringing his close friend Procopio to a second meeting. At a final meeting, Gattuso gave Kiley details of Berkshire's operations; Procopio agreed to provide and dispose of the getaway vehicles. Kiley told Gattuso that he would carry out the robbery along with two unnamed confederates. Procopio later told Gattuso that one of the participants in the robbery was named "Vinnie."  Charles Parise, an unindicted co-conspirator and friend of Gattuso's, testified that Procopio brought a car--the same Buick Regal identified by Mongeon as the get-away car--to Parise's garage at his home in Pittsfield on the night of the robbery. Parise said that he was forced to hide the car-- Procopio threatened him and his family--and to change its tires, and was later paid $8,000 for his trouble. This money he returned to the government. The defense cast doubt on Parise's credibility by pointing to statements by Parise's girlfriend suggesting that he had received more than $8,000. The next several days of the trial were devoted to the government's painstaking presentation of evidence of cash -6- -6- transactions, totaling nearly $330,000, by the defendants and their families in the months immediately following the robbery. For example, Kiley and Lattanzio travelled together to Jamaica, also treating several friends to the trip. The defendants' lavish spending occurred in spite of the fact that Kiley had no visible means of support, Procopio had been insolvent prior to the robbery, and Lattanzio had never declared over $15,000 of income in any one year. In addition, the government presented evidence of guns, a state police uniform, handcuffs, and a radio scanner that were seized from Kiley's apartment at 81 Intervale Street at the time of his arrest in June 1993; there was evidence that Lattanzio, whose father owned the building, was also spending time in the apartment, and that two of the guns seized there belonged to Lattanzio. Finally, the government played tapes of telephone conversations among Kiley and Lattanzio (who were in custody) and Procopio (out on bail) in which they discussed getting "back into business" and holding "another party" to which no "children" would be invited.  The defendants called a total of five witnesses, who testified to alternative sources for the funds that the defendants spent following the robbery. The defense claimed Kiley had funds from prior crimes; that Procopio had money from legitimate and illegitimate businesses that he had been hiding from the IRS and his ex-wife; and that John Lattanzio, -7- -7- Sr., Vincent's father and the depositor of much of the cash in question, had gambling winnings, again not reported to the IRS. In addition, the defense tried to establish that Kiley had been in Florida at the time Gattuso alleged some of their meetings had taken place. II. SEARCH AND SEIZURE __________________ Defendants challenge the district court's denial of several suppression motions before trial. Procopio objects to a search of his residence (in 1992); Kiley to searches of his residence (in 1992 and 1993) and to searches of his papers, recovered from a stolen safe (in 1991) and a briefcase seized after a traffic stop (in 1992). Lattanzio joins in the challenge to the admission of evidence seized from Kiley's Intervale Street apartment in 1993. June 1992 search of Kiley's and Procopio's properties. _______________________________________________________ In June 1992, Agent Howe of the IRS prepared an affidavit in support of a warrant to search four Pittsfield properties: *37 Taubert Ave. (Kiley's residence) *124 Crane Ave (Gattuso's residence) *56 South Onota St. (Procopio's residence) *483 West Housatonic St. (Procopio's garage) Howe's affidavit set out tips from four confidential informants. A first confidential informant (CI-1) had said that Kiley, Charles and Dino Gattuso, and Procopio had participated in the robbery; CI-1 had the information from -8- -8- Armand Bigelow, who heard it from his friend Dino Gattuso. The second tip, from CI-2, was that Charles Gattuso had talked about a $10,000 trip to California with his family, and had said that he still had $80,000 in cash that he was not "stupid enough to put in the bank." CI-3 stated that Charles Gattuso had buried money in his back yard and corroborated the information about the Gattuso family trip to California. CI-4 said that he had overheard a conversation in which Kiley's nephews said that Kiley was responsible for the "armored car heist" and flashed a large amount of currency to back up the boast. The Howe affidavit also described a pattern of spending by Kiley, Gattuso, and Procopio that was inconsistent with their known legitimate income. Bank records showed that Kiley had deposited over $42,000 in Florida banks within six months of the robbery; Procopio had spent $36,000 on a house in which Gattuso was residing and $12,000 on a new garage. The affidavit said that Gattuso, a close friend of Procopio, was a former Berkshire guard familiar with company procedures. Agent Howe also stated that--based on past cases involving drug dealers--individuals who have large amounts of cash from illegal sources often have contraband, proceeds, and records of their money-laundering efforts in their homes and places of business. Both Kiley and Procopio moved to suppress evidence from -9- -9- this search; the motion was denied in a 45-page order on May 16, 1994. On appeal, Kiley and Procopio argue that the district court's determination that Agent Howe's affidavit provided probable cause to search was flawed; Kiley also insists that the information was stale. Under Illinois v. Gates, 462 U.S. 213 (1983), probable ________ _____ cause to issue a search warrant exists when "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 238. In reviewing a ___ magistrate's decision to issue a warrant, the courts grant "great deference" to the magistrate's evaluation of the supporting affidavit, United States v. Jewell, 60 F.3d 20, 22 _____________ ______ (1st Cir. 1993), reversing only if there is no "`substantial basis for . . . conclud[ing]' that probable cause existed." Gates, 462 U.S. at 238-39. _____ Kiley and Procopio say that the first informant's tip was multi-level hearsay and that no evidence was provided to show the veracity of the unidentified informant. But the tip did not stand alone. There was information from three other informants which tended to corroborate CI-1's implication that Gattuso and Kiley had been involved in the robbery. Moreover, Kiley, Gattuso, and Procopio each began spending large sums of cash in the months following the robbery; Gattuso was known to be familiar with Berkshire's operating -10- -10- procedures; Procopio was a close friend of Gattuso's and, shortly after the robbery, purchased a house in which Gattuso was residing.  As to Kiley, two confidential informants identified him as a participant in the robbery, and the government had evidence of large cash deposits which appeared to have been structured to avoid triggering reporting requirements. Procopio's claim is a somewhat closer call, but the fact that Procopio had been spending large amounts of cash--including payments on a house in which Gattuso was residing--suggested that Procopio was involved at least in laundering the proceeds of a crime in which Gattuso had participated. Kiley makes two additional arguments. First, he says that Agent Howe's experience with drug dealers does not qualify him to speak about the habits of bank robbers. But what ties the two situations together is the criminal's need to dispose and keep track of large cash proceeds. Second, Kiley argues that the information supporting the warrant was stale because the crime had taken place 14 months before. Yet, the fact that the robbery had taken place many months in the past did not eliminate the likelihood that the paper trail of financial records could be found in Kiley's residence. Procopio argues that the district court erred in denying him a hearing under Franks v. Delaware, 438 U.S. 154 (1978). ______ ________ -11- -11- Franks provides for such a hearing where a defendant makes ______ "allegations of deliberate falsehood or of reckless disregard for the truth, . . . accompanied by an offer of proof." Id. ___ at 171. Procopio claimed in the district court that such a doubt about the agent's good faith exists here because Dino Gattuso, the alleged source of CI-1's information, later told the government that he did not recall discussing that information with anyone else. The district court properly refused to grant a Franks ______ hearing. Dino Gattuso's statement falls short of a specific denial that he ever discussed the matter with Bigelow; nor is there any indication that Agent Howe was aware of Dino's statement at the time Howe swore out the affidavit. The corroborating information, including the evidence of Procopio's unexplained expenditures, remains unaffected. Nothing appears to raise a reasonable suspicion of deliberate misconduct or recklessness on the part of the investigating agent. Kiley's papers from his brother's safe. On November 29, ______________________________________ 1991, a safe was stolen from Kiley's brother Donald; around that time, an abandoned safe was found in a park in Pittsfield, with papers inside the open safe and scattered on the ground nearby. The papers were taken to the police station and were laid out to dry and to be fingerprinted. A police detective noticed that some of the documents were in -12- -12- Bernard Kiley's name and called an FBI agent he knew to be investigating Kiley and the Berkshire robbery. The investigating agents reviewed the documents and used them to obtain Kiley's bank records by grand jury subpoena; these records supported the search of 37 Taubert Avenue. Kiley argues that the police actions were improper; he says that once the police knew whose safe it was and that the documents came from inside it, they had no need to conduct a review of the documents. In our view, any reasonable expectation of privacy Kiley enjoyed in documents secured in his brother's safe was destroyed by private action for which _______ the government was not responsible. United States v. ______________ Jacobsen, 466 U.S. 109, 113 (1984). And once the papers were ________ left openly available in a public place, their examination by government agents was not "unreasonable" under the Fourth Amendment. Cf. id. at 115-18. ___ ___ We thus join the Eleventh Circuit which held there was no Fourth Amendment violation in very similar circumstances in United States v. O'Bryant, 775 F.2d 1528, 1534 (11th Cir. _____________ ________ 1985). See also United States v. Aguirre, 839 F.2d 854, 857 ________ _____________ _______ (1st Cir. 1988). Because of the way we resolve this question, we need not reach the district court's holding that Kiley lacked standing to challenge the search of his brother's safe and, in the alternative, that the police search did not go beyond a proper inventory search.  -13- -13- Search of Kiley's briefcase following traffic stop. In ___________________________________________________ November 1992, a Lenox police office tried to pull Kiley over for driving with a broken headlight. Kiley jumped out of his car, ran into the woods, and was eventually caught by the police. The car was impounded and the contents inventoried in keeping with department policy. The police found a briefcase in the trunk; they opened the briefcase and found marijuana and incriminating documents detailing over $100,000 in expenditures. The police informed a federal agent who asked that the car be held while he obtained a warrant.  The district court held that the police department's search of the briefcase--which Kiley said was locked-- exceeded the bounds of its own policy covering inventory searches, and therefore did not come within the applicable exception to the Fourth Amendment. Florida v. Wells, 495 _______ _____ U.S. 1 (1990); South Dakota v. Opperman, 428 U.S. 364 ____________ ________ (1976). However, the court went on to hold that the "inevitable discovery" doctrine of Nix v. Williams, 467 U.S. ___ ________ at 444, saved the search. It reasoned that by November 1992, Kiley was already implicated in the Berkshire robbery investigation so that federal agents, being told of the briefcase, would surely have sought a warrant to inspect its contents.  The burden is on the government to show by a preponderance of the evidence that the evidence would -14- -14- inevitably have been discovered by lawful means. Nix, 467 ___ U.S. 431, 444 (1984); United States v. Infante-Ruiz, 13 F.3d _____________ ____________ 498, 503 (1st Cir. 1994). We review the district court's fact finding only for clear error, United States v. ______________ McLaughlin, 957 F.2d 12, 16 (1st Cir. 1992), but the __________ underlying facts are not in dispute. We will assume arguendo, favorably to the defendants, that the ultimate ________ determination (whether discovery here was inevitable) amounts to a question of law application that is reviewable de novo. __ ____ Cf. Ornelas v. United States, 116 S. Ct. 1657 (1996).  ___ _______ _____________ Kiley points out that the federal agents only obtained a warrant after being informed that the briefcase contained potentially incriminating bank records. He then argues that it is speculation to assume that, absent those records, the police would have called federal agents and that federal agents would have sought a warrant. And in fact, the local police called the federal authorities only after conducting what we will assume, for purposes of this argument, may have been an illegal search of the briefcase. Still, the local police knew that Kiley was the object of a federal robbery investigation. And Kiley made a blatant attempt to flee from the police when stopped for a minor traffic violation, leaving behind an allegedly locked briefcase. There is thus little reason to doubt that the local police would have contacted federal agents, even -15- -15- without the information gleaned during the search of the ______ briefcase itself. It is even more certain that federal agents, having ample time to do so, would have then sought a warrant to search the briefcase. In the alternative, Kiley questions whether without the documents the government would have had probable cause to search the briefcase. The evidence that justified the search of Kiley's residence would have established probable cause to believe that Kiley was involved in the crimes later charged; and Kiley's sudden flight and the locked briefcase would have given a magistrate reason to think that Kiley might well be carrying material pertaining to the crimes, which included money laundering. Search of Kiley's residence at 81 Intervale. Both Kiley ___________________________________________ and Lattanzio challenge the propriety of the search of Kiley's new residence at 81 Intervale Street in Brockton, Massachusetts. In June 1993, FBI and IRS agents obtained arrest warrants for Kiley and Lattanzio and a search warrant for 79 Intervale Road. Lattanzio was arrested outside the building (containing both 79 and 81 Intervale). The agents next entered 79 Intervale and were told by a tenant that a man resided upstairs; the agents called Kiley's name from the back stairs of the building and received a response from a third-floor apartment marked 81 Intervale. As Kiley left the building, he was arrested. -16- -16- IRS Agent Downes telephoned to another agent--Agent Crocker--to ask her to prepare a warrant application for the new address--81 Intervale. Her affidavit read in part: On June 8, 1993, I talked by telephone with Special Agent Gerard F. Downes who advised me that he was at Bernard Kiley's address at 81 Intervale, Brockton, MA., waiting to execute a search warrant . . . . Special Agent Howe advised me that upon arrival at the residence he discovered that the correct address for Kiley's residence was 81 Intervale Road, Brockton, MA. rather than 79 Intervale Road as listed in the original application and warrant. An amended warrant was issued, and the ensuing search revealed the cache of arms and other evidence later introduced at trial. The district court held that the warrant should not have issued to search 81 Intervale because nothing in the affidavit established probable cause to believe that Kiley lived there. In fact, the agent on the scene knew that surveillance had shown Kiley lived in the building, knew that his mail was delivered there, and knew that Kiley had been in the apartment moments before; but none of this information was included in the warrant application. However, the district court held that the evidence was saved by the "good faith" exception to the exclusionary rule. United States v. Leon, 468 U.S. 897 (1984). _____________ ____ We agree with the district court that Leon applies, an ____ issue we consider de novo. United States v. Manning, 79 F.3d __ ____ _____________ _______ 212, 221 (1st Cir. 1996). Leon protects good faith police ____ reliance on a magistrate search warrant, even if the warrant -17- -17- later proves invalid, unless inter alia the underlying ___________ affidavit is "so lacking in indicia of probable cause" as to make reliance upon it "entirely unreasonable." Leon, 468 ____ U.S. at 923 (quoting Brown v. Illinois, 422 U.S. 590, 610-11 _____ ________ (1975)) (Powell, J., concurring in part). See also United _________ ______ States v. Ricciardelli. 998 F.2d 8, 15 (1st Cir. 1993). ______ ____________ The focus in a warrant application is usually on whether the suspect committed a crime and whether evidence of the crime is to be found at his home or business. That hardly makes the address unimportant: to invade the wrong location is a serious matter. But so long as the affidavit itself asserts a link between the suspect and the address, it is easy to understand how both the officer applying for the warrant and the magistrate might overlook a lack of detail on a point often established by the telephone book or the name on a mailbox. In this instance, the second affidavit expressly recited that agent Downes had advised that he was "at Bernard Kiley's address at 81 Intervale . . . ." Thus, the affidavit included the agent's assertion that the address to be searched (81 Intervale) was that of the suspect (Kiley) as to whom probable cause had been shown; the only omission was the failure to explain how the agent--who had ample basis for the contention--knew that "81 Intervale" was "Kiley's address." Whether or not this is a defect in the application, it is -18- -18- hardly blatant, nor is there any suggestion (or basis for a suggestion) of actual bad faith. Thus, we conclude that Leon ____ applies. Cases like Nix and Leon may seem to some like ___ ____ technicalities that undermine Fourth Amendment protections. Others may view them as practical accommodations of tensions bound to arise where highly relevant evidence is threatened with exclusion in order to deter police misconduct. In all events, it is our job to apply these doctrines, as they have been developed by the Supreme Court, to the particular facts of each case.  -19- -19- III. RULE 404(b) EVIDENCE ____________________ Kiley and Lattanzio object to the admission of guns, handcuffs, a state police uniform and badge, and a police scanner seized at 81 Intervale.1 They have consistently argued that the items are inadmissible because their only tendency is to suggest that defendants are violent criminals and the items are character-propensity evidence prohibited by Fed. R. Evid 404. The government counters that the evidence is relevant to indicate a criminal association between Kiley and Lattanzio in 1991; the district court agreed, relying on our decision in United States v. Fields, 871 F.2d 188 (1st _____________ ______ Cir.), cert. denied, 493 U.S. 955 (1989), and also declined ____________ to exclude the evidence under Fed. R. Evid. 403.  Rule 404 provides that evidence of "other crimes, wrongs or acts" is not admissible to prove "the character of a person in order to show action in conformity therewith;" however, such evidence is admissible if offered for "other purposes." Id. See United States v. Moreno, 991 F.2d 943, ___ ___ _____________ ______ 946 (1st Cir.), cert. denied, 114 S. Ct. 457 (1993). If _____________ evidence "supports a chain of inference independent of any  ____________________ 1Procopio also attempts to raise this issue, arguing that the admission of this evidence prejudiced his defense. But "[o]bjections based on Rule 404(b) may be raised only by the person whose `other crimes, wrongs, or acts' are attempted to be revealed." United States v. David, 940 F.2d _____________ _____ 722, 736 (1st Cir.), cert. denied, 502 U.S. 989 (1991). _____________ Procopio asked for and was granted repeated instructions to the effect that the 81 Intervale evidence did not relate to him. -20- -20- tendency of the evidence to show bad character," Moreno, 991 ______ F.2d at 946, it is said to have "special relevance" and not barred by Rule 404. Here, such special relevance is easy to articulate (the strength and significance of the inference are a different matter). Plainly, the seized materials, found in an apartment used by both Kiley and Lattanzio, tended to suggest that in 1993 the two men had a criminal association. This to some extent suggested a criminal association in 1991, which was helpful to the government's claim that the two men had collaborated in the Berkshire robbery in 1991. Thus, the inference goes somewhat beyond the mere implication that either man was of bad character.  True, the seized items might have belonged only to one of the two men. Or an association between them might have been criminal in 1993 but innocent in 1991. But these possibilities affect only the strength of the government's inference. A later criminal association increases the likelihood of an earlier one--which is all that "relevance" requires, Fed. R. Evid. 401; United States v. Tutiven, 40 _____________ _______ F.3d 1, 6 (1st Cir. 1994)--and numerous cases permit such reasoning from a later event or condition to an earlier one. E.g., United States v. Andiarena, 823 F.2d 673, 677 (1st Cir. ____ _____________ _________ 1987).  In all events, we agree with the district court that we -21- -21- crossed this bridge in Fields. There, three defendants were ______ charged with conspiracy and bank robbery. Three years after the robberies, two of the defendants were caught in a stolen car containing various "tools of the trade" for armed robbers. The evidence was admitted at trial over an objection based on Rule 404. This court upheld the district court, holding that the evidence "shed light on the nature of [the defendants'] association at the time of the crimes charged." Fields, 871 F.2d at 198. ______ On appeal, defendants seek to distinguish Fields, ______ primarily on the ground that the permissible inference pointing toward guilt in that case was somewhat stronger on the facts. This may be so, although we there noted that the similarity between the charged crime and the subsequent acts was "most likely insufficient to show a "`signature.'" Id. ___ at 197. But it seems to us that, so long as some "special relevance' is shown, the bar of Rule 404 is crossed and the issue is then one of balancing probative value against prejudice under Rule 403. This Rule 403 judgment was undoubtedly a close one on the present facts. The criminal association was itself merely inferred (Lattanzio did not live permanently at the apartment), and the need to reason backward from 1993 to 1991 further weakens the inference. And here, as is often the case with Rule 404(b) evidence, the permissible inference -22- -22- (criminal association) overlapped with, and went only a small step beyond, the forbidden one (criminal character). This in turn increases the difficulty for the jury and the risk of prejudice. On the other hand, some would think that the evidence confirmed a criminal association as of 1993, indeed, an association probably designed to perpetrate robberies. Arguably, the two year gap was less important than usual, given an admitted association of some kind in 1991 (albeit in the months after the robbery). The evidence was scarcely redundant.2 And the presence of guns at the apartment, while telling, is not such as to overwhelm the emotions of an ordinary juror in the manner of gruesome testimony or photographs. In sum, the issue was at best a close one which a reasonable judge might have decided either way. The district court enjoys great latitude in making an on-the-spot balancing judgment under Rule 403, Manning, 79 F.3d at 217, _______ and we cannot find any abuse of discretion here. This is especially so in view of Fields where similar evidence was ______  ____________________ 2As the Advisory Committee Notes to Rule 403 point out, "[i]n reaching a decision whether to exclude evidence on grounds of unfair prejudice, . . . [t]he availability of other means of proof may also be an appropriate factor." In this instance, a prior association between Kiley and Lattanzio was amply proved by other evidence (e.g., of their ____ trips) but nothing else directly indicated the criminal character of the association. -23- -23- upheld by this court. The truly difficult problem for us is not the admission of the evidence but the use made of it by the prosecutor in closing, a subject to which we will shortly return.  IV. PROSECUTORIAL MISCONDUCT ________________________ All these defendants object to various comments made by the prosecutor in his rebuttal argument, and argue that the trial judge erred in failing to grant a mistrial. Several of the comments were the subject of timely objection and the claims of error are fully preserved; the others are reviewable for plain error. United States v. Wihbey, 75 F.3d _____________ ______ 761 (1st Cir. 1996). Comment on Failure to Testify. The first charge is that _____________________________ the prosecutor impermissibly commented on the defendants' failure to testify. Counsel for Kiley and Lattanzio argued in their closing that the jury could find cause for doubt in the government's failure to ask the Berkshire guards to identify Kiley's and Lattanzio's voices from the prison tapes. In its rebuttal, the government replied: And why didn't the Government play tapes for the guards and see if they recognized the defendants' voices. You heard from two of the defense counsel if we had, and if the guards identified the voices. Is there anybody here that thinks that the defendants would have come in the courtroom and fessed-up, or would they have just created more illusions for argument. An objection was made, but the district judge saw no impropriety. -24- -24- What the prosecutor was trying to say was that defense counsel were making a commotion about a lack of evidence from the guards but, if such testimony had been offered, counsel would then have belittled it. The prosecutor's reference was inartful and could be taken--especially out of context--as an improper comment. But it was certainly not an intentional ___________ comment on the failure to testify. And in context, it was at most a glancing brush rather than a blow against the privilege. The district judge included in the closing instructions the standard warning: that defendants have an absolute right not to testify and that no inference should be drawn from a failure to testify. If any juror mistook the prosecutor's comment to suggest otherwise, that suggestion was squarely corrected not long afterwards by the judge. We are completely confident that the comment did not affect the outcome, and although perhaps technically a violation, was harmless beyond a reasonable doubt. Chapman v. California, _______ __________ 386 U.S. 18 (1967). Comment on propensity to violence. ___________________________________ All defendants complain on appeal about the following remarks by the prosecutor: These defendants, make no mistake about it, share a violent and vicious criminality. The arsenal at Intervale and Frank's explicitly saying they will go into the criminal business again have no other explanation. Our society doesn't need it. I submit to you society has had enough of Frank Procopio, Bernie Kiley, and Vinnie Lattanzio.  -25- -25- This comment was improper for two reasons. First, the "society doesn't need it" comment "served no purpose other than to `inflame the passions and prejudices of the jury.'" United States v. Machor, 879 F.2d 945, 956 (1st Cir. 1989), _____________ ______ cert. denied, 493 U.S. 1081 (1990) (quoting in part prior ____________ precedent). Second, and more troubling, the prosecutor's remarks encouraged the jury to conclude from the 81 Intervale evidence that the defendants were "violent and vicious" criminals. This inference--that the defendants were of bad character--was precisely the inference that Rule 404(a) forbids.  However, defense counsel failed to object at trial to these remarks by the prosecutor. Reviewing courts are very reluctant to reverse for unobjected-to errors that could have been corrected or ameliorated by timely objection. Arrieta- ________ Agressot v. United States, 3 F.3d 525, 528 (1st Cir. 1993). ________ _____________ Consonantly, under the "plain error" test, the error has to be obvious and affect "substantial rights," and the failure to reverse the conviction must cause a miscarriage of justice. United States v. Olano, 113 S. Ct. 1770, 1777-79 _____________ _____ (1993). We regard this set of comments as presenting a very close call, at least as to Lattanzio. Against Kiley, the direct evidence was strong; but Lattanzio was not directly identified by anyone, and the government's case against him -26- -26- was based on adequate, but hardly overwhelming, circumstantial evidence. If Lattanzio had objected at trial and if (which we doubt in light of the final instructions) the district court had ignored or overruled the objection, it might be hard for the government to show the error was harmless. United States v. Randazzo, 80 F.3d 623, 631 (1st _____________ ________ Cir. 1996). But here, it is Lattanzio who must show that the improper remarks likely infected the jury (affected "substantial rights" in Olano's words) and mere possibilities _____ are not enough. The assault on the guards and the weaponry found at Intervale were facts permissibly before the jury. What was added was improper commentary; but this is not a case in which the jury learned of inadmissible events, something far more likely to infect fatally the jury's reasoning. Similarly, under Olano's miscarriage of justice _____ standard, we think the prosecutor more culpable here than in the "fess up" comment; that was merely inadvertent and this was seriously careless. But it is important to note that the district court, in closing instructions the next day, did give a pointed warning to the jury:  During closing arguments yesterday, certain counsel made certain remarks that were heated and inflammatory, perhaps depending on how you look at them, and certainly emotional. -27- -27- I ask you to totally disregard what counsel may have said in a heated fashion. Your job is to determine the truth . . . . The court also firmly reminded the jury that the Intervale evidence was not to be used as propensity evidence. These are the very curative instructions that would have been given if a timely objection had been made. The fact that the defense did not object also may suggest that, in the conditions of the courtroom, the passage in question passed by as mere rhetoric. In all events, we are not persuaded under Olano that this misstep, taken in light of the curative _____ instructions, probably altered the result or produced a fundamentally unfair trial. Implication of threats. Defendants, during closing ________________________ arguments, attempted to cast doubt on Gattuso's reliability by referring to the fact that the government had paid him and reduced the charges against him. The government responded: Mr. Graham objected, apparently a moral objection, because the Government spent $10,000 on subsistence expenses for Charlie Gattuso before he entered the witness protection program, as part of that program. I'm sure that Mr. Graham and the other defendants would have preferred he not be here, and he not testify, and I want to apologize on behalf of the government for protecting his life. Defendants argue that the comment unfairly implied that the defendants would prefer to see Gattuso dead and in fact posed a threat to him. They also suggest that the jury could have had its doubts aroused by Abbott's absence, but in fact any -28- -28- hint that he had been murdered was scrupulously excluded from the trial.  The jury already knew that Gattuso was in a witness protection program, presumably for his protection, and obviously the defendants would have preferred that Gattuso not testify. The implication that the defendants posed a threat to Gattuso's life is more troubling, but it was indirect, utterly unsupported, and occurred during a legitimate attempt to explain (in response to defense impeachment) why the money had been spent. We do not think that the criticized comment, although over the line of propriety, affected the defendants' substantial rights. Disparagement of counsel. The prosecutor told the jury ________________________ that defense arguments were "illusions . . . a smoke screen aimed at creating that, an illusion to . . . deflect you from the single thread of truth that . . . unifies all the evidence in the case." Then the government stated, "This isn't a game . . . the robbery wasn't a game, and I've got news for the defense counsel, this trial isn't a game either." Only Lattanzio objected to this statement at trial; he asked for a curative instruction which was given. No further objection was raised.  "The prosecutor is expected to refrain from impugning, directly or by implication, the integrity or institutional role of defense counsel." United States v. Bennett, 75 F.3d _____________ _______ -29- -29- 40, 46 (1st Cir. 1996), petition for cert. filed (June 5, _________________________ 1996) (No. 95-9237). The prosecutor's remarks, although more wind than rain, were arguably excessive disparagement. But a corrective instruction was asked for and given, and it is unrealistic to suggest that such empty cliches seriously affected the jury's deliberations. Defendants said at oral argument that the prosecution had attempted in these appeals to defend its improper remarks piecemeal, glossing over the cumulative impact. Cumulative impact is a legitimate concern, cf. United States v. Manning, ___ _____________ _______ 23 F.3d 570, 575 (1st Cir. 1994), but the only remark that raised serious risk of prejudice was the "vicious and violent criminality" comment. Nor did the other comments form a pattern that would tend to reinforce the improper inference there encouraged. We are thus satisfied that the improper arguments, even taken as a whole, do not merit reversal. They do merit some criticism of the prosecution. Contrary to the epigram, a fault is not worse than a crime; but a pattern of faults does suggest a failure in supervision. The government should not have to devote almost 20 pages of its brief to explaining away problems with its arguments to the jury. It is happenstance that the prosecution has done more damage to its own reputation than -30- -30- to the defendants' right to a fair trial.3  V. CONCLUSION __________ Defendants have raised some additional arguments in their briefs. Among others, Procopio claims that he was affected by the Intervale evidence and also that it was error for the district court to deny his motion to sever. Kiley and Lattanzio object to the admission of certain tape recordings on hearsay grounds and under Bruton v. United ______ ______ States, 391 U.S. 123 (1968). Lattanzio objects to the ______ admission of a photograph of cash in a clothes drier and also argues that the district court erred by failing to instruct the jury on the meaning of reasonable doubt. We have carefully considered defendants' arguments on these and on a few additional points, primarily related to the instructions and additional instances of allegedly improper argumentation by the prosecutor. In our view, none of these points presents a strong claim of error and none, even if error, involves any serious risk of prejudice. It was fair for defense counsel to raise these issues in the course of their thorough and extensive briefs, but they do not require further discussion by us. Affirmed. _________  ____________________ 3 In light of our criticism of the rebuttal argument, we think it fair to note that the assistant United States Attorney who argued this case on appeal was not the prosecutor who presented the rebuttal argument at trial. -31- -31-