# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellant,*

v.

DARNELL WILLIAMS, a/k/a Nellie;
LARRY THOMAS,

        *Defendants-Appellees.*

No. 08-4014

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.
(1:06-cr-00449-RDB-2)

Argued: October 30, 2008

Decided: December 3, 2008

Before WILLIAMS, Chief Judge, and NIEMEYER and
KING, Circuit Judges.

---

Reversed and remanded by published opinion. Judge King
wrote the opinion, in which Chief Judge Williams and Judge
Niemeyer joined.

---

## COUNSEL

**ARGUED:** Philip S. Jackson, OFFICE OF THE UNITED
STATES ATTORNEY, Baltimore, Maryland, for Appellant.

Kenneth Wendell Ravenell, Baltimore, Maryland; Joseph John Gigliotti, Sr., Silver Spring, Maryland, for Appellees. **ON BRIEF**: Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellant. William J. Morrow, THE MURPHY FIRM, Baltimore, Maryland, for Appellee Darnell Williams.

---

**OPINION**

KING, Circuit Judge:

The government challenges, by way of this interlocutory appeal, the district court's Order suppressing evidence seized pursuant to search warrants from the residences of drug conspiracy defendants Darnell Williams and Larry Thomas. *See United States v. McCoy*, No. 1:06-cr-00449 (D. Md. Oct. 24, 2007). In so ruling, the district court recognized that the government had conceded there was no probable cause to support the search warrants, and it rejected the government's position that the seized evidence was nevertheless admissible under the good faith exception to the Fourth Amendment exclusionary rule, as articulated in *United States v. Leon*, 468 U.S. 897 (1984). On appeal, the government — though acknowledging that it previously conceded lack of probable cause — urges us to reverse the suppression ruling on the ground that the warrants were supported by probable cause. Alternatively, the government maintains that the district court erred in refusing to apply the *Leon* good faith exception. As explained below, we need only reach the *Leon* issue, on which we reverse and remand.

I.

A.

On August 31, 2006, Special Agent Paul Neikirk of the

Drug Enforcement Administration, Baltimore District Office, applied to a Maryland state court for a "Search and Seizure Warrant" relating to the "Premise" 3516 Sandpiper Court, Edgewood, Maryland (the "Sandpiper Court warrant"). *See* J.A. 3.[1] The warrant application also refers to the "Person" Darnell Williams. *Id.* In support of the application, Neikirk outlined his expertise, including involvement in at least thirty drug trafficking investigations, the arrests of more than 500 drug suspects, the making of at least ten affidavits in support of search warrants, and the execution of more than 100 such warrants. *See id.* at 5. He also submitted a twenty-page affidavit (the "Sandpiper Court affidavit"), plus a single-page exhibit listing property to be seized. On the first page of the Sandpiper Court affidavit, Neikirk again refers to the "Person" Darnell Williams and the "Premise" 3516 Sandpiper Court, and he avers that "[y]our Affiant believes that probable cause exists for the issuance of said warrant for these premise(s) . . . which are being used for the illegal use, storage, sale, packaging and concealment of controlled dangerous substance[s]." *Id.* at 7. Later in the Sandpiper Court affidavit, Neikirk lists 3516 Sandpiper Court as Williams's address, *see id.* at 9-10, and specifically asserts that "[t]his location is believed to be the primary residence of Darnell Williams," *id.* at 25. The Sandpiper Court affidavit also includes such identifying information as Williams's date of birth and Social Security number. *See, e.g.*, *id.* at 9.

The bulk of the Sandpiper Court affidavit details the investigation into Williams and his alleged coconspirators (including Thomas), which investigation involved, inter alia, a confidential informant, controlled purchases, intercepted phone calls, and physical surveillance. The Sandpiper Court affidavit reflects, for example, the following:

---

[1]Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

- After identifying Thomas "as a mid-level narcotic dealer," the confidential informant made controlled purchases of "multiple ounces of cocaine from Thomas on numerous occasions from January 2006-May 2006," J.A. 7;

- The subsequent court-approved interception of calls made on a phone utilized by Thomas led Special Agent Neikirk to secure court authorization to intercept calls made on eight other phones, including two cell phones used by Williams, *see id.* at 7-11;

- Between July 9, 2006, and August 25, 2006, investigators intercepted fifteen calls involving Williams that Neikirk believed, based on his training and experience, to be "drug pertinent," *see id.* at 14-25; and

- In August 2006, investigators conducted physical surveillance of Williams meeting with suspected drug suppliers in Houston, Texas, after learning that Williams had made arrangements to fly there, *see id.* at 23.

According to the Sandpiper Court affidavit, the investigation "established that Darnell Williams is managing an ongoing drug distribution network that operates throughout the United States of America[,] [i]ncluding[ ] Maryland, Georgia, South Carolina and Texas, with at least one ultimate street level distribution point being in the Baltimore, Maryland Metropolitan area." *Id.* at 12. The Sandpiper Court affidavit also reflects that Williams pleaded guilty in February 1994 in a Maryland state court to possession with intent to distribute controlled dangerous substances, as well as controlled dangerous substance distribution with a firearm, and that there had been numerous other state criminal charges brought against him between 1993 and 2000. *See id.* at 13-14.

The Sandpiper Court affidavit does not specify any particular evidence — such as evidence gathered from intercepted phone calls or physical surveillance — linking the Sandpiper Court dwelling to drug trafficking activity. Special Agent Neikirk asserts therein, however, that

> [y]our Affiant knows based on his training and experience that drug dealers tend to maintain quantities of narcotics, firearms and proceeds from drug sales and records of drug transactions in their houses . . . for safekeeping. Your Affiant knows based on his training and experience that drug dealers often utilize safes and other locked containers in their residence to secure quantities of drugs, firearms and proceeds from drug sales. . . . Your Affiant has also learned that narcotic dealers tend to "stash" quantities of narcotics, monies, and handguns in their houses.

J.A. 12. This training- and experience-based knowledge, together with the evidence of drug trafficking gathered against Williams, gave rise to Neikirk's "belie[f] that probable cause exists that Darnell Williams is storing controlled dangerous substances, firearms, proceeds from drug transactions and business records thereof at 3516 Sandpiper C[ourt]." *Id.* at 13; *see also id.* at 25 ("[A]s a result of your Affiant[']s involvement in this investigation, and his expertise and experience in the investigation of dangerous drugs, your Affiant believes that there is presently concealed within the aforesaid dwelling . . . items constitut[ing] evidence that relates to the illegal distribution and possession with the intent to distribute controlled dangerous substances . . . .").

At the close of the Sandpiper Court affidavit, Special Agent Neikirk seeks authorization for a "no knock entry," explaining that "[t]his location is believed to be the primary residence of Darnell Williams," that "it is possible that he could be home at the time the warrant is executed," and that Williams has a history of violence (including prior arrests for assault with

intent to murder and various firearms offenses) indicating a risk to the executing officers. J.A. 25-26. Finally, Neikirk reiterates that, "[a]s a result of the above listed [intercepted phone] calls and probable cause corroborated from the confidential source, your Affiant believes that sufficient probable cause exists that the narcotics laws of Maryland are being violated with the dwelling of 3516 Sandpiper Court." *Id.* at 26.

At the same time he sought the Sandpiper Court warrant (on August 31, 2006), Special Agent Neikirk also applied to the Maryland state court for a "Search and Seizure Warrant" relating to the "Premise" 135 Baltimore Avenue, Baltimore, Maryland (the "Baltimore Avenue warrant"). *See* J.A. 30. That warrant application refers to the "Person" Larry Thomas. *Id.* In support of the application, Neikirk again outlined his expertise, and he submitted a seventeen-page affidavit (the "Baltimore Avenue affidavit"), plus a single-page exhibit listing property to be seized. The first page of the Baltimore Avenue affidavit refers to the "Person" Larry Thomas and the "Premise" 135 Baltimore Avenue, and contains an assertion of probable cause identical to that found in the Sandpiper Court affidavit. *Id.* at 34 ("Your Affiant believes that probable cause exists for the issuance of said warrant for these premise(s) . . . which are being used for the illegal use, storage, sale, packaging and concealment of controlled dangerous substance[s] . . . .") Also on the first page of the Baltimore Avenue affidavit, Neikirk lists 135 Baltimore Avenue as Thomas's address, *see id.*, and later therein Neikirk specifically asserts that "[t]his location is believed to be the primary residence of Larry Thomas," *id.* at 50.[2] The Baltimore Avenue affidavit also includes such identifying information as Thomas's date of birth and Social Security number. *See, e.g.*, *id.* at 34.

---

[2]The Baltimore Avenue affidavit varyingly refers to the Baltimore Avenue residence as being located in Baltimore, Maryland, and Dundalk, Maryland (an unincorporated community in Baltimore County). The parties do not contend, however, that these varying references have any significance to the propriety of the district court's suppression ruling.

The majority of the Baltimore Avenue affidavit details the investigation into Thomas, Williams, and their alleged coconspirators. Specific to Thomas, the Baltimore Avenue affidavit (like the Sandpiper Court affidavit) reflects that he was identified as a mid-level drug dealer by the confidential informant, that the informant made controlled purchases of cocaine from Thomas between January and May 2006, and that Neikirk thereafter secured authorization to intercept calls made on a phone utilized by Thomas, leading to the court-approved interception of calls made on eight other phones. *See* J.A. 34-38. The Baltimore Avenue affidavit also provides information about approximately two dozen intercepted calls involving Thomas that Neikirk believed to relate to drug transactions. *See id.* at 41-49. The Baltimore Avenue affidavit reflects that Thomas last reported earned wages in 2001, and that he had been convicted in Maryland state courts on three separate occasions in 2000 of controlled dangerous substance and assault offenses. *See id.* at 40.

Like the Sandpiper Court affidavit, the Baltimore Avenue affidavit does not specify any particular evidence linking the dwelling to be searched to drug activity. The Baltimore Avenue affidavit includes, however, an identical assertion of knowledge, based on Special Agent Neikirk's training and experience, "that drug dealers tend to maintain quantities of narcotics, firearms and proceeds from drug sales and records of drug transactions in their houses . . . for safekeeping." J.A. 39. Based on this knowledge and the evidence of Thomas's drug trafficking, Neikirk concludes in the Baltimore Avenue affidavit "that probable cause exists that Larry Thomas is storing controlled dangerous substances, firearms, proceeds from drug transactions and business records thereof at 135 Baltimore Avenue." *Id.* at 40; *see also id.* at 49 ("[A]s a result of your Affiant's involvement in this investigation, and his expertise and experience in the investigation of dangerous drugs, your Affiant believes that there is presently concealed within the aforesaid dwelling . . . items constitut[ing] evidence that relates to the illegal distribution and possession

with the intent to distribute controlled dangerous substances
. . . .").

In closing, Special Agent Neikirk seeks permission in the
Baltimore Avenue affidavit for a "no knock entry," specifying
that "[t]his location is believed to be the primary residence of
Larry Thomas" and detailing the potential danger posed by
him (including the fact that he was heard "firing a handgun
repeated times" during intercepted phone calls and threatening
on one such call to "shoot his way out"). J.A. 49-50. Lastly,
Neikirk asserts that, "[a]s a result of the above listed [inter-
cepted phone] calls and probable cause corroborated from the
confidential source, your Affiant believes that sufficient prob-
able cause exists that the narcotics laws of Maryland are being
violated with the dwelling of 135 Baltimore Avenue." *Id.* at
50.

On August 31, 2006, after reviewing and initialing each
page of the respective supporting affidavits, the Maryland
state court approved both the Sandpiper Court warrant and the
Baltimore Avenue warrant. The warrants were executed on
September 11, 2006. From the Sandpiper Court dwelling,
officers seized $295,000 in cash. From the Baltimore Avenue
dwelling, officers seized a firearm, cocaine residue, and vari-
ous items commonly used in drug distribution, such as a digi-
tal scale and numerous empty capsules.[3]

## B.

A grand jury in the District of Maryland indicted Williams
and Thomas, along with other alleged coconspirators, on one
count of conspiracy to distribute cocaine, in contravention of
21 U.S.C. § 846. Thereafter, Williams filed a motion to sup-

---

[3]Although unnecessary to the resolution of the issues in this appeal, we
observe that it is undisputed that, at the time the search warrants were exe-
cuted, Williams was residing in the Sandpiper Court dwelling, and
Thomas was living in the Baltimore Avenue dwelling.

press evidence seized from the Sandpiper Court dwelling, and Thomas filed a motion to suppress evidence seized from the Baltimore Avenue dwelling. The district court conducted a hearing on the motions on October 12, 2007.

On October 24, 2007, the district court issued its Order granting the motions to suppress, as well as a Memorandum Opinion (the "Opinion") explaining its ruling.[4] The court observed in the Opinion that the government conceded both in its response to the motions and at the October 12, 2007 hearing that there was no probable cause to support the search warrants, i.e., "that there was insufficient information outlined in the supporting affidavits connecting 3516 Sandpiper Court and 135 Baltimore Ave[nue] with the alleged criminal activity." Opinion 2. The court then recognized that the government sought "to avoid suppression because of the good faith exception outlined in *United States v. Leon*, 468 U.S. 897 (1984)." *Id.* at 3. The court refused to apply the *Leon* good faith exception, however, on the ground that the supporting affidavits were fatally "bare bones." *Id.* at 4. This was so, in the court's view, because the affidavits were "devoid of any specific evidence suggesting how the place to be searched is related to the criminal activity," *id.* at 5, and because they contained no evidence that Williams and Thomas were currently residing in the targeted dwellings, *see id.* at 5 n.4.

The government timely noted this interlocutory appeal. We possess jurisdiction pursuant to the provisions of 18 U.S.C. § 3731.[5]

---

[4]The Order is found at J.A. 57-58, and the Opinion is found at J.A. 59-64.

[5]In accordance with the jurisdictional predicate of 18 U.S.C. § 3731, the United States Attorney has certified that this interlocutory appeal "is not taken for purpose of delay" and that the excluded evidence "is a substantial proof of a fact material in the proceeding."

## II.

On appeal, the government contends that the district court erred in granting the motions to suppress because, notwithstanding its concession to the contrary, the Sandpiper Court and Baltimore Avenue warrants were supported by probable cause. Alternatively, the government contends that the seized evidence is admissible under the good faith exception to the Fourth Amendment exclusionary rule articulated in *United States v. Leon*, 468 U.S. 897 (1984). The parties differ, as a threshold matter, over whether we can properly consider the first contention in light of the government's acknowledgment that it conceded lack of probable cause in the district court. We need not resolve such an issue, however, because we agree with the government's second contention: that, at the very least, the *Leon* good faith exception applies. *See United States v. Legg*, 18 F.3d 240, 243 (4th Cir. 1994) (recognizing "that a reviewing court may proceed to the good faith exception without first deciding whether the warrant was supported by probable cause" (citing *Leon*, 468 U.S. at 925)). In reaching this conclusion, we utilize a de novo standard of review. *See United States v. DeQuasie*, 373 F.3d 509, 520 (4th Cir. 2004) (observing that, where "there are no facts in dispute, the applicability of the *Leon* exception . . . is purely a legal conclusion, and we review the district court's ruling de novo").

## A.

As the Supreme Court instructed in *Leon*, "a court should not suppress the fruits of a search conducted under the authority of a warrant, even a 'subsequently invalidated' warrant, unless 'a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002) (quoting *Leon*, 468 U.S. at 922 n.23). The *Leon* Court explained "that the deterrence purpose of the exclusionary rule is not achieved through the suppression of evidence obtained by 'an officer acting with objective good faith'

within the scope of a search warrant issued by a magistrate." *United States v. Perez*, 393 F.3d 457, 461 (4th Cir. 2004) (quoting *Leon*, 468 U.S. at 920). "Hence, under *Leon*'s good faith exception, evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was 'objectively reasonable.'" *Id.* (quoting *Leon*, 468 U.S. at 922).

The *Leon* Court admonished that searches conducted "pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (internal quotation marks omitted). An officer's reliance on a warrant would *not* qualify as "objectively reasonable," however, in the following four circumstances:

- First, where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," *id.* at 923;

- Second, where "the magistrate acted as a rubber stamp for the officers and so 'wholly abandoned' his detached and neutral 'judicial role,'" *Bynum*, 293 F.3d at 195 (quoting *Leon*, 468 U.S. at 923);

- Third, where a supporting affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *Leon*, 468 U.S. at 923 (internal quotation marks omitted); and

- Fourth, where "a warrant [is] so facially deficient — *i.e.*, in failing to particularize the place to be searched or the things to be seized — that the

executing officers cannot reasonably presume it
to be valid," *id.*

"In any of these four circumstances, then, the *Leon* good faith
exception does not apply." *Perez*, 393 F.3d at 461.

### B.

Here, the district court concluded that application of the
*Leon* good faith exception was barred by the existence of the
third circumstance, i.e., that the Sandpiper Court and Balti-
more Avenue affidavits were "so lacking in indicia of proba-
ble cause as to render official belief in its existence entirely
unreasonable." *Leon*, 468 U.S. at 923 (internal quotation
marks omitted).[6] More specifically, the court deemed the affi-
davits to be fatally "bare bones" in two ways: first, in being
"devoid of any specific evidence suggesting how the place to
be searched is related to the criminal activity," Opinion 5 (the
"criminal activity-dwelling nexus"); and second, in lacking
evidence that Williams and Thomas were currently residing in
the targeted dwellings, *see id.* at 5 n.4 (the "defendant-

---

[6]We note that the district court misidentified the third circumstance bar-
ring application of the *Leon* good faith exception, using the following lan-
guage: "when the affidavit does not provide the magistrate with a
substantial basis for determining the existence of probable cause." Opinion
3 (internal quotation marks omitted). As we explained in *Bynum*,

> "'[s]ubstantial basis' provides the measure for determination of
> whether probable cause exists in the first instance. If a lack of a
> substantial basis also prevented application of the *Leon* objective
> good faith exception, the exception would be devoid of sub-
> stance. In fact, *Leon* states that the third circumstance prevents a
> finding of objective good faith only when an officer's affidavit is
> "so lacking in indicia of probable cause as to render official belief
> in its existence entirely unreasonable." This is a less demanding
> showing than the "substantial basis" threshold required to prove
> the existence of probable cause in the first place.

293 F.3d at 195 (quoting *Leon*, 468 U.S. at 923 (internal quotation marks
omitted)) (other citations omitted); *see also DeQuasie*, 373 F.3d at 521
n.17.

dwelling nexus"). We assess these two aspects of the court's suppression ruling — on the criminal activity-dwelling nexus and on the defendant-dwelling nexus — in turn.

1.

We begin our assessment with the district court's ruling on the criminal activity-dwelling nexus. The pertinent question in this regard is whether the Sandpiper Court and Baltimore Avenue affidavits were "so lacking in indicia of probable cause" tying the targeted dwellings to criminal activity "as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (internal quotation marks omitted). The government defends the affidavits on the ground that they contained sufficient indicia of probable cause on the criminal activity-dwelling nexus to justify application of the *Leon* good faith exception by (1) extensively detailing the evidence of Williams's and Thomas's involvement in drug trafficking activities and (2) including Special Agent Neikirk's assertion of knowledge, based on his training and experience, "that drug dealers tend to maintain quantities of narcotics, firearms and proceeds from drug sales and records of drug transactions in their houses . . . for safekeeping." J.A. 12, 39. The district court, however, rejected the government's reliance on Neikirk's assertion of training- and experience-based knowledge, leaving the government with only the evidence of drug trafficking. *See* Opinion 4-5. And, as the court observed, "there were no reports of any drug use at either 3516 Sandpiper Court or 135 Baltimore Ave[nue]," and "any suspicious activity engaged in by Defendant Williams and Defendant Thomas occurred nowhere near" those premises. *Id.* at 4 (internal quotation marks omitted). Viewing only the evidence of drug trafficking unconnected to the targeted premises, the court deemed the affidavits fatally "bare bones." *Id.* (relying on *United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996) (determining affidavit based largely on uncorroborated tip

from anonymous telephone caller to be "bare bones" and unworthy of *Leon* good faith exception)).**7**

In these circumstances, we first address whether the district court properly discounted Neikirk's assertion of training- and experience-based knowledge to tie Williams's and Thomas's drug trafficking activities to their residences. According to the court, "[a] lack of actual evidence in the affidavits cannot be remedied by the claim — asserted in both supporting affidavits — that 'drug dealers tend to maintain quantities of narcotics, firearms and proceeds from drug sales and records of drug transactions in their houses . . . for safekeeping.'" Opinion 5 (quoting Sandpiper Court and Baltimore Avenue affidavits (J.A. 12, 39)). For this proposition, the court relied on its own prior suppression ruling in *United States v. Cotton*, No. 1:05-cr-00409, 2005 WL 3591960, at *7 (D. Md. Dec. 23, 2005) (concluding that "the mere opinion by a police officer that drug dealers keep drugs in their residences must be supported by some other objective facts relating to the residence").**8**

Simply put, the district court's view is directly at odds with our precedent. We have consistently determined that there was probable cause to support search warrants — and not merely sufficient indicia of probable cause to justify application of the *Leon* good faith exception — in similar circumstances. That is, we have upheld warrants to search suspects' residences and even temporary abodes on the basis of (1) evi-

---

**7**The district court suggested — as did this Court in *Wilhelm* — that, because of the "bare bones" nature of the affidavits, the application of the *Leon* good faith exception was barred by the existence of the second circumstance, i.e., that the magistrate judge acted as a rubber stamp for the officer in approving the warrants. *See* Opinion 3-4; *see also Wilhelm*, 80 F.3d at 123.

**8**The government did not appeal the district court's suppression ruling in *Cotton*. The defendant, however, appealed from the court's refusal to suppress other evidence, and we affirmed in an unpublished per curiam opinion. *See United States v. Cotton*, No. 06-4530, 2007 WL 664909 (4th Cir. Mar. 6, 2007).

dence of the suspects' involvement in drug trafficking combined with (2) the reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes. *See United States v. Grossman*, 400 F.3d 212, 217-18 (4th Cir. 2005); *United States v. Servance*, 394 F.3d 222, 230 (4th Cir.), *vacated on other grounds*, 544 U.S. 1047 (2005); *United States v. Williams*, 974 F.2d 480, 481-82 (4th Cir. 1992); *United States v. Suarez*, 906 F.2d 977, 984-85 (4th Cir. 1990). As we explained in *Grossman*,

> [w]hen issuing a warrant and making a probable cause determination, judges are to use a "totality of the circumstances analysis." This standard is not defined by bright lines and rigid boundaries. Instead, the standard allows a magistrate judge to review the facts and circumstances as a whole and make a common sense determination of whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." The magistrate judge's decision in this regard is one we review with great deference.

*Grossman*, 400 F.3d at 217 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)) (other internal quotation marks omitted). As part of such a common sense determination, we observed in *Grossman*, "it is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key." *Id.* at 218; *see also Servance*, 394 F.3d at 230 (recognizing "that the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence" (internal quotation marks omitted)).[9]

---

[9]Notably, the district court acknowledged our *Williams* decision in its Opinion. The court rejected *Williams*, however, on the ground, inter alia, that it "dealt with whether a sufficient nexus existed in order to establish probable cause, a point that had been conceded in this case." Opinion 5

In light of our precedent, the district court erroneously discounted Special Agent Neikirk's assertion of training- and experience-based knowledge to tie Williams's and Thomas's drug trafficking activities to their residences. Had the court given due consideration to Neikirk's assertion, together with the extensive evidence of Williams's and Thomas's drug trafficking activities detailed in the Sandpiper Court and Baltimore Avenue affidavits, it could not have concluded that the affidavits were "bare bones" with respect to the criminal activity-dwelling nexus. *See Wilhelm*, 80 F.3d at 121 (recognizing that a "bare bones" affidavit is "one that contains wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause" (internal quotation marks omitted)).[10] Indeed, the court would have necessarily determined that the affidavits were not "so lacking in indicia of probable cause" tying the targeted dwellings to criminal activity "as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (internal quotation marks omitted). Accordingly, the district court erred in refusing to apply the *Leon* good faith exception in this aspect of its suppression ruling.[11]

n.4. Of course, even accepting that the government irrevocably conceded the issue of whether the Sandpiper Court and Baltimore Avenue warrants were supported by probable cause, *Williams* is yet entirely relevant to the issue of whether the *Leon* good faith exception applies, i.e., whether the supporting affidavits were "so lacking in indicia of probable cause" tying the targeted dwellings to criminal activity "as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (internal quotation marks omitted).

[10]To the extent that Williams and Thomas argue on appeal that the Sandpiper Court and Baltimore Avenue affidavits failed to establish probable cause that they were engaged in drug trafficking, we disagree.

[11]For the criminal activity-dwelling nexus aspect of its suppression ruling, the district court did rely on one of our decisions, *United States v. Lalor*, 996 F.2d 1578 (4th Cir. 1993). *See* Opinion 2 ("The United States Court of Appeals for the Fourth Circuit has stated that 'residential searches have been upheld only where some information links the criminal

2.

Finally, we assess the district court's ruling with respect to the defendant-dwelling nexus. On this question, the district court observed that in contrast to the scenario in this Court's *Williams* decision — wherein we recognized that the supporting affidavit "'contain[ed] evidence that [the defendant] was currently residing in the'" targeted motel room — such scenario was "not the case here." Opinion 5 n.4 (quoting *Williams*, 974 F.2d at 481 (alterations in original)); *see also Grossman*, 400 F.3d at 215-16 (describing evidence compiled by officer linking Grossman to each of three searched dwellings); *Servance*, 394 F.3d at 230 (observing that physical surveillance placed Servance in targeted dwelling earlier in day of search); *Suarez*, 906 F.2d at 979 (noting that search warrant application was based, inter alia, on officers' surveillance of Suarez during day before search, when he was seen walking to targeted residence of his girlfriend).

We recognize that the Sandpiper Court and Baltimore Avenue affidavits contain bare assertions that the targeted dwell-

---

activity to the defendant's residence.'" (quoting *Lalor*, 996 F.2d at 1583)). In *Lalor*, we concluded that a search warrant for the defendant's residence was not supported by probable cause. *See* 996 F.2d at 1583. In so doing, however, we distinguished Lalor's case from prior ones, including *Suarez* and *Williams*, wherein the nexus between criminal activity and the targeted premises was based on evidence of the suspect's drug trafficking activities combined with the reasonable inference that drug-related evidence would be found in the suspect's home. *See id.* at 1582-83 (recognizing that, in *Suarez*, "residential search upheld based on officer's reasoned belief that evidence of drug activity would be found at residence"); *id.* at 1583 (observing that, in *Williams*, "totality of facts establishe[d] fair probability that drug paraphernalia w[ould] be found in drug dealer's motel room"). Moreover, although we invalidated the search warrant in *Lalor*, we concluded — unlike the district court here — that the evidence seized thereunder was nevertheless admissible pursuant to the *Leon* good faith exception. *See id.* at 1583. *Lalor*, therefore, actually undercuts the criminal activity-dwelling nexus aspect of the court's suppression ruling.

ings were Williams's and Thomas's current residences, without explicitly describing how Special Agent Neikirk came to believe that was so. Nonetheless, we cannot say that the affidavits were "so lacking in indicia of probable cause" that the targeted dwellings were the current residences of Williams and Thomas "as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (internal quotation marks omitted). The affidavits detail Neikirk's investigation of Williams, Thomas, and their alleged coconspirators — an investigation spanning at least seven months and involving a confidential informant, controlled purchases, intercepted phone calls, and physical surveillance. The affidavits also provide identifying information about Williams and Thomas, including dates of birth, Social Security numbers, and criminal histories. These details of the affidavits give rise to the common sense inference that Neikirk learned through his investigation — by way of, for example, information from the confidential informant, observations during physical surveillance, record checks, or some combination of all of the above — that Williams and Thomas lived in the targeted dwellings.

In these circumstances, we are constrained to conclude that the district court erred in refusing to apply the *Leon* good faith exception in the defendant-dwelling nexus aspect of its suppression ruling. *Cf. United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998) (deeming *Leon* good faith exception applicable where affidavit "described the location of the [targeted dwelling] with such particularity that a common sense inference is that the affiant visited the premises himself and presumably either observed [the suspect] in the residence, or determined through investigation that [the suspect] frequented the premises"); *United States v. Procopio*, 88 F.3d 21, 28 (1st Cir. 1996) (characterizing officer's failure to explain how he knew targeted dwelling was suspect's residence as "hardly blatant" nor suggestive of actual bad faith, and, thus, applying *Leon* exception). As the First Circuit recognized in *Procopio*,

> [t]he focus in a warrant application is usually on whether the suspect committed a crime and whether

> evidence of the crime is to be found at his home or business. That hardly makes the address unimportant: to invade the wrong location is a serious matter. But so long as the affidavit itself asserts a link between the suspect and the address, it is easy to understand how both the officer applying for the warrant and the magistrate might overlook a lack of detail on a point often established by the telephone book or the name on a mailbox.

88 F.3d at 28; *see also United States v. Harris*, 215 F. App'x 262, 272 (4th Cir. 2007) (unpublished) (applying *Leon* good faith exception, despite officers' omission from affidavit (1) that Harris resided in targeted premises and (2) their grounds for believing that Harris lived there, because "[t]he apartment to be searched is prominently identified in the affidavit, and it is easy to read the affidavit and not realize that the officers failed to connect the final dots specifically linking Harris to the apartment" (citing *Procopio*, 88 F.3d at 28)).[12]

### III.

Pursuant to the foregoing, we reverse the district court's October 24, 2007 Order granting Williams's and Thomas's motions to suppress, and remand for such other and further proceedings as may be appropriate.

*REVERSED AND REMANDED*

---

[12]We find it unnecessary to accept the government's invitation to consider the October 12, 2007 hearing testimony of Special Agent Neikirk in which he explained to the district court how he came to believe that the targeted dwellings were Williams's and Thomas's residences. *See Bynum*, 293 F.3d at 199 (declining to resolve the "difficult question" of whether "additional facts, which the government proved were known to the affiant police officer, but not revealed to the magistrate prior to issuance of the search warrant, could be considered in the *Leon* analysis"). That is, "[w]holly apart from the information known to [Neikirk] but not included in his affidavit[s], th[ose] affidavit[s] contained sufficient indicia of probable cause so as not to render reliance on [them] totally unreasonable." *Id.*