**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4796

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ANTONIO MILLER,

Defendant - Appellant.

Appeal from the United States District Court for the District of South Carolina at Aiken.
Mary G. Lewis, District Judge.  (1:17-cr-00770-MGL-1)

Argued:  January 31, 2020                          Decided:  April 15, 2020

Before KEENAN, HARRIS, and QUATTLEBAUM, Circuit Judges.

Affirmed by unpublished opinion.  Judge Harris wrote the opinion, in which Judge Keenan
and Judge Quattlebaum joined.

**ARGUED:**  Emily Deck Harrill, OFFICE OF THE FEDERAL PUBLIC DEFENDER,
Columbia, South Carolina, for Appellant.  Thomas Ernest Booth, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Brian A.
Benczkowski, Assistant Attorney General, Matthew S. Miner, Deputy Assistant Attorney
General, Appellate Section, Criminal Division, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C.; Sherri A. Lydon, United States Attorney, Columbia, South
Carolina, J.D. Rowell, Assistant United States Attorney, OFFICE OF THE UNITED
STATES ATTORNEY, Denver, Colorado, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PAMELA HARRIS, Circuit Judge:

In 2008, Antonio Miller and a group of co-conspirators participated in the early-morning robbery, torture, and murder of a rival drug trafficker. Later that day, police officers visited Miller's home in response to an unrelated complaint that Miller's wife had not returned a rental car on time. Warrantless searches of two cars parked beside Miller's home uncovered guns and a large bag of crack cocaine. Officers then obtained a warrant to search Miller's home, and discovered guns, drugs, ammunition, and blood-caked shoes that linked Miller to his rival's murder. Using that evidence, federal authorities brought criminal charges against Miller. Miller pleaded guilty on all counts, but reserved the right to appeal the district court's decision declining to suppress the evidence obtained from the car and home searches.

In this appeal, Miller argues – for the first time – that the evidence seized from the cars on his property and from his home should have been suppressed because the officers unlawfully intruded on the curtilage of his home before conducting the searches. He also argues that even if the officers' entry onto his property was constitutional, the evidence obtained from his home should have been suppressed because the warrant application failed to establish a nexus between his home and any criminal activity. We conclude that Miller cannot prevail on either argument and thus affirm his convictions.

# I.

## A.

In early 2008, Miller became involved in a conspiracy to manufacture and distribute crack cocaine in Columbia, South Carolina.[1]  Later that summer, Miller persuaded his co-conspirators that the group should rob Fred Tucker, a drug dealer known to Miller from a prior stint in prison who also happened to be a cousin of one of Miller's co-conspirators, Melvin Cummings.  And so, in the early morning hours of September 15, 2008, Miller and three co-conspirators drove from Columbia to Tucker's home in Aiken, South Carolina. Upon arriving, they broke into the residence, forced Tucker to strip at gunpoint, and bound him with duct tape.  The conspirators then interrogated Tucker about the location of drugs and cash in his home, burning him repeatedly with a flat-head screwdriver and firing multiple shots into a wall in his home.  As the conspirators finally left the home, Miller shot Tucker in the chest.

For their drive to Tucker's home, the conspirators used a green Ford Taurus previously rented by Miller's wife, Deidre King.  On the morning of Tucker's murder, Jeffrey Day, a manager at the auto rental company, noticed that the rental car was overdue for return.  Using a global positioning system ("GPS") device attached to the car, Day determined that it had been driven to Aiken, miles away from his company's location in Columbia.  Day called the Richland County Sheriff's Department ("RCSD") and reported

---

[1] Because we are reviewing a denial of a motion to suppress, we recount the relevant facts in the light most favorable to the government.  *See United States v. Jones*, 942 F.3d 634, 637 (4th Cir. 2019).

4

that King had breached her rental contract. He also provided information about Miller, King, and the rental car, including King's address – 5520 North Main Street – and stated that Miller sometimes paid for and drove the rental car in King's stead. Hours later, Day was able to report to RCSD that the car had been driven back to Columbia and that the GPS put it near King's home.

At that point, RCSD officers began the response that set the stage for Miller's suppression motion. From a "staging area" near King's address, they could see a green car matching Day's description parked against the rear portion of the residence. As they drove to Miller's house, they saw a car driven by Cummings turn into Miller's driveway, then stop directly behind the rental car, within the curtilage of Miller's home.[2] The officers followed Cummings's car into the driveway and parked their patrol car.

The officers then immediately approached a small group of people standing near the rental car and asked whether King and Miller were present. When nobody spoke up, the officers asked for identification so they could determine whether the rental car's driver was present. They also noted that the rental car's appearance, license plate, and vehicle identification number matched the information provided by Day. Eventually, each member of the group gave the officers a name and date of birth, save Cummings, who provided his driver's license. A database search revealed that Cummings had a suspended driver's

---

[2] While the district court did not make an express finding that the cars were parked within the curtilage, the government does not contest this fact. Accordingly, we deem it admitted for purposes of this appeal. *Cf. United States v. Foreman*, 369 F.3d 776, 778 n.1 (4th Cir. 2004).

license and that one other member of the group – later confirmed to be Miller – had provided a false identity. This prompted the officers to place Cummings under arrest and to question Miller further about his identity.

Then came two automobile searches, including the search of the rental car. While the officers were processing Cummings's arrest, they saw Miller walk over to Cummings's car and get inside of it. The officers quickly removed Miller from Cummings's car and briefly searched it, discovering two handguns that Cummings identified as belonging to Miller. To secure any additional weapons that might be on the scene, the officers then searched the rental car. Immediately upon opening the door, they saw a plastic bag containing a large amount of crack cocaine.

The officers continued their investigation, speaking separately with the group members and then contacting certain drug informants and the police in Aiken County, where Tucker was murdered. When the officers discovered that Cummings was related to Tucker and had been named as a person of interest in his death, they prepared an application for a search warrant for King and Miller's home. That search warrant is the subject of Miller's second argument on appeal.

The proposed warrant listed the place to be searched as "a single-story single-family dwelling" located at 5520 North Main Street. J.A. 40. The items to be seized were listed as "crack cocaine and marijuana, cellular phones, pagers . . . . [p]araphernalia, paperwork and other items associated with [drug trafficking] . . . . [w]eapons, US currency and articles of personal property tending to establish the identity of persons in control of areas where the aforementioned items are found." J.A. 40. A supporting affidavit described the report

6

of an overdue rental car at 5520 North Main Street and the officers' observation of that car and encounter with Miller at that address. It went on to describe the discovery of cocaine inside the rental car and Miller's extensive criminal history, including at least 12 arrests for narcotics offenses. It then explained that, based on their experience, the officers expected "that additional narcotics [would] be recovered from inside" the residence: Individuals at the scene of drug activity often carry weapons and store drugs in vehicles on the property, and drugs are commonly found "within the curtilage of illegal drug sales locations." J.A. 42.

A state-court magistrate approved the proposed search warrant. The resulting search of Miller's home uncovered crack cocaine, drug paraphernalia, three handguns, and various forms of ammunition. The officers also seized two pairs of athletic shoes that one officer recognized as counterfeit. Subsequent analyses revealed that the shoes matched prints left at the scene of Tucker's murder, that blood on the shoes had come from Tucker, and that the weapons seized from Miller's home matched bullet casings found in Tucker's home.

State authorities were the first to charge Miller for offenses stemming from Tucker's murder. Before his state trial, Miller moved to suppress the evidence seized from his home, arguing that the application for the search warrant failed to establish any nexus between the drugs found in the rental car and his residence, and thus probable cause that evidence would be discovered within the home itself. The state trial court denied Miller's motion, and a jury convicted Miller of all charges. Miller appealed his convictions, which the South Carolina Court of Appeals affirmed. *See State v. Miller*, No. 2014-UP-409, 2014 WL

7

6488693 (Nov. 19, 2014). But the South Carolina Supreme Court reversed, finding that the affidavit for the home search warrant "failed to establish probable cause that evidence of a crime may be contained within the residence sought to be searched." *State v. Miller*, No. 2015-000365, 2016 WL 1244403, at *1 (Mar. 30, 2016).

## B.

That brings us to the federal prosecution at issue in this appeal. After Miller's state convictions were vacated, federal authorities indicted Miller on three charges related to Tucker's death: using a firearm during a crime of violence causing death, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(j)(1)–(2); kidnapping resulting in death, in violation of 18 U.S.C. §§ 1201(a)(1)–(2); and conspiracy to possess with intent to distribute 280 grams or more of crack cocaine, resulting in death, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, 848.

In the district court, Miller moved to suppress the evidence obtained as a result of the searches of the rental car and his home. Miller's first argument focused on the search of the rental car: According to Miller, that search violated the Fourth Amendment both because the officers lacked probable cause for the search and because they had used GPS tracking data to locate the rental car without getting a warrant for that data. And because the crack cocaine discovered in the illegal search of the rental car was used to obtain the home search warrant, Miller reasoned, the evidence seized from his home was "fruit of the

8

poisonous tree" and thus inadmissible.[3] Miller also advanced a second argument, this one focused directly on the home search: Even if the cocaine discovered in the rental car was admissible, Miller contended, the evidence seized from his home should be suppressed because, as the South Carolina Supreme Court had ruled, the warrant affidavit failed to establish probable cause for the search of his residence.

The district court held a hearing on Miller's suppression motion. Most of the hearing was devoted to the issues raised in Miller's motion and to the government's response to those arguments. In particular, the court focused on whether Miller had standing to challenge the search of the rental car – that is, whether he had a reasonable expectation of privacy in a car leased by someone else and after that lease had expired. Near the end of the hearing, however, Miller's counsel for the first time noted that the rental car was on private property, and that the officers "had no right without a search warrant to even begin to come onto the property to look around and see what's there." J.A. 596. At no point in this brief discussion did counsel suggest that his trespass-based argument might provide an alternative ground for suppression even if Miller did not have standing to object to the search of the rental car itself.

---

[3] Miller expressly declined to challenge the separate search of Cummings's car, conceding that he "obviously lack[ed] standing to contest" that search and informing the district court that it was "not the subject of" any defense objection. J.A. 194, 204. In light of that express waiver, to the extent Miller now seeks to challenge that search and suppress the handguns it uncovered, we will not consider those arguments. *See United States v. Claridy*, 601 F.3d 276, 284 n.2 (4th Cir. 2010) ("When a claim of . . . error has been waived, it is not reviewable on appeal.").

The district court denied Miller's motion to suppress. *United States v. Miller*, No. CR 1:17-770-MGL, 2018 WL 1858947 (D.S.C. Apr. 18, 2018). With respect to the search of the rental car, the court held that Miller lacked standing to challenge the search. *See id.* at *6–7. Miller was not the official lessee of the car and "was not listed as an authorized driver on [King's] rental agreement," the court explained. *Id.* at *6. Moreover, the lease had expired, and "the [v]ehicle was overdue to be returned." *Id.* Accordingly, "[a]s an unauthorized driver of a breach of trust vehicle," *id.*, Miller "had no reasonable expectation of privacy in the" car and thus could not challenge its search, *id.* at *7. The district court made no mention of the trespass theory to which Miller's counsel had alluded at the hearing.

As for the search of the house, the district court first rejected Miller's argument that it was bound, under principles of collateral estoppel and res judicata, by the South Carolina Supreme Court's holding that the warrant was unsupported by probable cause. *See id.* at *7. Instead, the court proceeded directly to the "good faith" doctrine of *United States v. Leon*, 468 U.S. 897 (1984), and held that because the officers reasonably relied on a search warrant in conducting their search of Miller's residence, the evidence obtained from that search was admissible. *See id.* at *7–8.

Following the district court's decision, Miller entered into a written plea agreement and pleaded guilty to all three counts in the federal indictment. State authorities agreed not to re-prosecute Miller in state court for any crimes related to Tucker's death, and Miller retained his right to appeal the district court's denial of his suppression motion. The district

10

court accepted Miller's plea and sentenced him to 360 months' imprisonment and five years' supervised release. Miller then noted this timely appeal.

## II.

### A.

We turn first to the search of the rental car and begin by clarifying the argument that Miller is advancing on appeal. Importantly, Miller does not challenge the district court's ruling that he lacked a reasonable expectation of privacy in the rental car and thus had no standing to challenge its search.[4] Instead, he argues – for the first time on appeal – that even without standing to contest the search of the rental car itself, he is entitled to suppression of the evidence obtained from that search: According to Miller, because the officers unconstitutionally intruded into the curtilage of his home when they entered his driveway and approached the people standing nearby, all of the evidence the officers subsequently discovered – not only the drugs seized from the rental car, but also the handguns from Cummings's car and the evidence from the house – must be suppressed, because it all is tainted by the initial illegal trespass. We review this claim for plain error, and find none.

---

[4] Soon after the district court's decision, the Supreme Court held in *Byrd v. United States* "that the mere fact that a driver in lawful possession or control of a rental car is not listed on the rental agreement will not defeat his or her otherwise reasonable expectation of privacy." 138 S. Ct. 1518, 1531 (2018). Because Miller is not appealing the district court's ruling on standing, we have no occasion to consider the possible implications of *Byrd* for that ruling.

11

1.

When a defendant fails to raise an argument before the district court and the district court does not pass on the issue, we review only for plain error. *See United States v. Tate*, 845 F.3d 571, 575 (4th Cir. 2017). To establish plain error, a defendant must show that the district court's failure to suppress evidence was error, that the error is plain, and that the error both affected his "substantial rights" and calls into question "the fairness, integrity, or public reputation of judicial proceedings." *United States v. Brack*, 651 F.3d 388, 392 (4th Cir. 2011) (citation omitted). Under our precedent, "[a]n error is plain when it is obvious or clear under current law." *Id.* (internal quotation marks and citation omitted).

Because Miller did not raise his trespass-based argument for suppression before the district court – and the district court accordingly did not address it – it is subject to the plain-error standard on appeal. Miller's motion to suppress made no mention of this theory and challenged the search of the rental car only on two different grounds: that the officers lacked probable cause to enter the rental car, and that the officers improperly relied on GPS data without a warrant. Indeed, Miller's motion cannot be reconciled logically with his new position on appeal: As Miller now argues, his trespass theory extends equally to the evidence uncovered from the search of Cummings's car as to the search of the rental car, but in his suppression motion, Miller expressly waived any challenge regarding Cummings's car.

Nor did Miller's brief allusions at the suppression hearing to an intrusion onto his curtilage put the district court on notice of his new trespass-based theory. That is not only because, as the government argues, Miller mentioned trespass only in snippets and in

12

passing. The bigger problem is that none of those snippets connected the dots for the district court: At no point did Miller clarify that the argument he was hinting at was not simply an alternative ground for finding the search of the rental car unconstitutional, but instead an independent basis for suppressing all of the evidence in the case even if he lacked standing to challenge the rental car search itself. Indeed, even on appeal, it has been left to us to tease out the full dimensions of Miller's position. Under these circumstances, we conclude that Miller did not properly raise his trespass-based theory before the district court, and that we may review it now only for plain error.

2.

On appeal, Miller relies virtually exclusively on the Supreme Court's decision in *Collins v. Virginia*, 138 S. Ct. 1663 (2018), which he argues so squarely controls that the district court plainly erred by failing to suppress based on the officers' intrusion onto his curtilage. We disagree.

Although the facts of *Collins* involve a trespass onto curtilage and a vehicle search, the legal principle at issue in that case differs importantly from the one presented here. In *Collins*, a police officer walked onto a private driveway without a warrant, and lifted a tarp to inspect a motorcycle. *See id.* at 1668. The Virginia Supreme Court held that the officer's warrantless search of the motorcycle was justified by the automobile exception to the Fourth Amendment, which permits warrantless searches of vehicles under certain circumstances. But the Supreme Court reversed, holding that the automobile exception could not justify the officer's initial intrusion onto the defendant's curtilage, *see id.* at 1672–73, "the area 'immediately surrounding and associated with the home,'" which is

13

treated as "part of the home itself for Fourth Amendment purposes," *id.* at 1670 (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). The legal rule established by *Collins*, then, is that the *automobile exception* does not provide a "lawful right of access" to a home's curtilage. *Id.* at 1672. And that rule has no direct application here: The government never argued, and the district court did not hold, that the automobile exception justified the officers' initial entry onto Miller's driveway.

Instead, as the government argues, Miller's claim is properly assessed under *Florida v. Jardines*, in which the Supreme Court held that a warrantless search accomplished through an "unlicensed physical intrusion" onto a constitutionally protected area, including the curtilage around a house, violates the Fourth Amendment. 569 U.S. at 7. But at the same time, the Court recognized, not every police entry onto curtilage is "unlicensed." Rather, a police officer, like any visitor, has an "implicit license" to "approach [a] home in order to speak with the occupant." *Id.* at 8, 9 n.4; *see also Kentucky v. King*, 563 U.S. 452, 469 (2011) ("When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do.") So the question in this case is whether the officers were within the scope of this well-established "knock and talk" license when they crossed into Miller's driveway and approached the people standing there – or, more precisely, whether it was plain error to treat them as though they were.

We do not think Miller can show plain error here. Although the knock-and-talk doctrine is sometimes framed as a right to "approach the home by the front path" or knock on a front door, *see Jardines*, 569 U.S. at 8; *King*, 563 U.S. at 469, we have made clear that the implicit license is broader than that, and allows an officer to go elsewhere "when

14

circumstances reasonably indicate that the officer might find the homeowner elsewhere on the property." *Covey v. Assessor of Ohio Cty.*, 777 F.3d 186, 193 (4th Cir. 2015) (citation omitted). Thus, we have held that an officer, without a warrant, may proceed directly into a homeowner's backyard when he sees a group of people located there and reasonably could infer that the homeowner likely was among them. *See Alverez v. Montgomery Cty.*, 147 F.3d 354, 358–59 (4th Cir. 1998). And while the police do not have an implicit license or invitation to conduct a search on private property, *see Jardines*, 569 U.S. at 9–10, a "knock and talk" is permissible so long as there is a "legitimate purpose" for entering curtilage that is "unconnected with a search of the premises," *Covey*, 777 F.3d at 193 n.6.

In light of those precedents, it is not "clear and obvious," *see United States v. Denton*, 944 F.3d 170, 182 (4th Cir. 2019) (applying standard for plain error), that the officers exceeded the scope of their implicit license to enter Miller's curtilage. Based on their review of King's car rental agreement, which listed 5520 North Main Street as her home address, and Day's description of the relationship between King and Miller, the officers had reason to believe that both King and Miller lived at the residence in question. When they arrived and saw a group of people standing just beside the home, they – like the officer in *Alverez* – could "reasonabl[y] . . . proceed there directly as part of their effort to speak with" King and Miller. 147 F.3d at 359. And once there, by Miller's own account in his motion to suppress, the officers immediately asked to speak with King and Miller, the presumed homeowners and drivers of the rental car, rather than inspecting the rental car or otherwise "reveal[ing] a purpose to conduct a search." *Jardines*, 569 U.S. at 10. We recognize Miller's argument that the officers, by activating the blue lights on their patrol

15

car when they entered his driveway, engaged in coercive conduct that went beyond the "customary invitation" offered all visitors. *Id.* at 9. But Miller has identified no case law addressing that nuance, and on plain error review, we cannot say that the officers so clearly exceeded their license to "knock and talk" that the denial of Miller's suppression motion was plainly erroneous on this ground.[5]

## B.

We turn next to Miller's alternative argument: that the evidence obtained from the search of his home must be suppressed because the warrant for the search was not based on probable cause. The district court rejected that argument, finding that the officers searched Miller's home in objectively reasonable reliance on the search warrant, and that the evidence thus was admissible under *Leon*'s "good faith" exception. We agree with the district court.

Because Miller raised this issue in his suppression motion, we review the district court's legal conclusions de novo and any associated factual findings for clear error. *See United States v. Thomas*, 908 F.3d 68, 72 (4th Cir. 2018). We also accord "great deference" to a magistrate judge's decision to issue a search warrant, "ask[ing] only whether the judicial officer had a 'substantial basis' for finding probable cause." *United States v. Jones*, 942 F.3d 634, 638 (4th Cir. 2019) (quoting *Illinois v. Gates*, 462 U.S. 213, 236–38 (1983)).

---

[5] Because we find no plain error in the rejection of Miller's trespass-based claim on the merits, we need not address the government's alternative argument that even if there had been a Fourth Amendment violation, suppression would not be warranted under the inevitable discovery doctrine. Nor need we address the government's contention that Day gave authorized consent for a search of the rental car.

16

And even if a search warrant later is determined to be deficient under this standard, under *Leon*'s good-faith doctrine, the evidence obtained will be suppressed only if the executing officer could not rely on the warrant in objectively reasonable good faith. *See Leon*, 468 U.S. at 922–23.

On appeal, as before the district court, Miller argues that the search warrant affidavit failed to establish any nexus at all between criminal activity in general and his house in particular. According to Miller, for example, there was nothing in the affidavit linking the rental car – or the drugs found inside it – to his house, or even linking Miller himself to the residence. Without such information, Miller finishes, there was no probable cause that criminal evidence would be found inside the home, and that deficiency was so apparent from the face of the warrant affidavit that no reasonable officer could have relied on the warrant in objective good faith.

But as the district court found, the affidavit in fact "articulates a number of facts" that could support the requisite nexus between the criminal drug activity described in the affidavit and Miller's residence at 5520 North Main Street. *See Miller*, 2018 WL 1858947, at *8. The affidavit did link Miller to the residence in question, explaining that the officers had encountered him there while attempting to recover an overdue rental car tracked to the same location and leased to a "Deidra Miller," presumably Miller's wife. J.A. 41. It also linked the drugs uncovered on the scene to the house, describing the crack cocaine discovered in the rental car on the premises and the officers' experience-based knowledge that drugs commonly are found "within the curtilage of illegal drug sales locations." J.A. 42; *see also United States v. Williams*, 548 F.3d 311, 319 (4th Cir. 2008) (affidavit

17

established nexus between criminal activity and dwelling by detailing the suspects' involvement in drug trafficking and explaining that, in the affiant's experience, drug traffickers store drug-related items in their homes). Given the posture of this case, we have no occasion to decide whether the affidavit satisfies the probable cause standard. It is sufficient, as the district court held, that the affidavit is not "so lacking in indicia of probable cause" to search Miller's home "as to render official belief in its existence entirely unreasonable" under *Leon*. *Id.* at 318 (quoting *Leon*, 468 U.S. at 923).

We do not want to suggest that this is a close question. But were there any doubt, we, like the district court, would find it dispelled by the decisions of the South Carolina courts. *See Miller*, 2018 WL 1858947, at *8. It is true, as Miller emphasizes, that the South Carolina Supreme Court held that the warrant application at issue here did not establish probable cause for a search of Miller's home – though even that court suggested that the evidence nevertheless might be admissible, perhaps through the good-faith exception. *See State v. Miller*, No. 2015-000365, 2016 WL 1244403, at *1 (Mar. 30, 2016). But considering the same warrant application, the South Carolina Court of Appeals came to a different conclusion, holding that it did establish a sufficient nexus between Miller's criminal activity and his home. *See State v. Miller*, No. 2014-UP-409, 2014 WL 6488693, at *1 (Nov. 19, 2014). A defendant always bears a heavy burden when he argues after-the-fact that an officer could not rely in objective good faith on a search warrant, and we think that burden is even heavier where, as here, an appellate court already has approved the warrant. *Cf. Leon*, 468 U.S. at 926 (finding officers' reliance on a warrant was objectively

18

reasonable where there was "disagreement among thoughtful and competent judges as to the existence of probable cause").

Because the executing officers relied in objectively reasonable good faith on a warrant when they searched Miller's home for evidence, we affirm the district court's application of *Leon* and find that the evidence obtained from Miller's home would have been admissible had Miller proceeded to trial.

## III.

For the foregoing reasons, we affirm Miller's convictions.

*AFFIRMED*